SO ORDERED: August 14, 2008.



_____
Anthony J. Metz III
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| LAMAR RAYMOND GRIMES | ) | CASE NO. 07-4744-AJM-7 |
| | ) | |
| Debtor | ) | |
| | ) | |
| HENRY HOWARD | ) | |
| | ) | |
| Plaintiff | ) | Adversary Proceeding |
| | ) | No. 07-50489 |
| vs. | ) | |
| | ) | |
| LAMAR RAYMOND GRIMES | ) | |
| | ) | |
| Defendant | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Henry Howard ("Howard" or the "Plaintiff") filed his Complaint to Determine Dischargeability of Debt on August 19, 2007 against the Lamar Raymond Grimes ("Grimes" or the "Defendant"). The complaint sought nondischargeability under both 11

1

U.S.C. §523(a)(2) and (a)(4).  Summary judgment was entered in favor of the Defendant on the §523(a)(4) count.  Trial on the §523(a)(2) count was held on June 19, 2008 wherein the Plaintiff and the Defendant appeared in person along with their respective counsel, John Blevins and Steve Taylor.  The Court took the matter under advisement at the conclusion of the trial.  The Court, having considered the testimony of the witnesses, the arguments of counsel, and all evidence admitted now makes its findings of fact and conclusions of law in accordance with F. R Bankr. P. 7052.

**Findings of Fact**

1. From July, 2002 to November, 2006, the Defendant, as sole proprietor, operated a trucking business known as Rambling Fever Trucking ("Rambling Fever").  The Defendant drove a truck for Rambling Fever and the Defendant's wife, Angela, ("Angela") kept its books.

2. Worthington Primose Transportation Management ("Worthington"), hired Rambling Fever to haul its freight.  Worthington paid the Defendant for loads hauled, but the timing of the payments varied.  Generally, Worthington would pay the Defendant up front, as soon as the Defendant's driver picked up the load.  Occasionally, the Defendant would not be paid until the load was delivered and Worthington had received the original bill of lading.  Loads delivered during the operative period germane to this matter generated anywhere from $1,500 to $4,500 of revenue for the Defendant.

3. The Defendant in June, 2005 ran a newspaper ad seeking a driver to haul freight for Rambling Fever.  The Plaintiff contacted him and was hired.  Pursuant to the agreement reached between the Defendant and the Plaintiff, the Plaintiff was to

    drive a Rambling Fever truck to haul freight and was to "check call" in everyday between 8 a.m. and 10 a.m.  The Plaintiff was also required to send his "logs" (paperwork, including each "drop sheet", fuel trip report and bill of lading) in every week, and would not get paid until the Defendant received the paperwork.  The Defendant agreed to pay the Plaintiff 25% of what the Defendant received from Worthington to haul the load, less cash advances.

4.   Rambling Fever maintained and funded a "T check account" from which its drivers could pay for fuel while on the road hauling freight.  Any cash advances requested by and paid to the driver would also come out of the "T check account" and those advances were later credited against the pay due the driver when the charges were reconciled at the end of the trip.  If the "T check account" contained insufficient funds for either or both fuel and driver advances, the driver would then be required to complete and send paperwork to Worthington, after which time Worthington would "confirm", and issue a "COM check" for the amount of the requested fuel or advance.  Thus, Worthington would be aware that a driver was on a particular trip by the confirmation and issuance of a "COM check".  The Plaintiff testified that he did not regularly use the T-check account but rather paid for fuel more often with a "COM check".

5.   The Plaintiff started hauling freight on July 5th and made trips also on July 7th and July 12th.  Each trip had a corresponding "trip number".  The July 5th trip was trip #536, the July 7th trip was trip #537, and the July 12th trip was trip #538  The Defendant testified he promptly completed the paperwork for these trips.  On July 22nd, Angela reviewed the paperwork submitted and computed the amount

owed to the Plaintiff for trips #536 and #537 and computed the amount owed on trip #538 on July 27th.  If the Plaintiff submitted the paperwork for all three trips at the same time, and Angela first computed the amounts owed as early as July 22nd, then only 10 days expired between Angela's computations and the last trip.  At the most, a period of 15 days expired between the Plaintiff's last trip and the time Angela computed the Plaintiff's compensation.  Angela issued a check to the Plaintiff in the amount of $1515.41 (the "First Check") on July 28th, payment for trips #536, #537 and #538.  Angela testified that either the Plaintiff or his wife, Wendy ("Wendy") went to the Defendant's home and picked that check up in person.

6. Wendy accompanied the Plaintiff on all trips after July 15th in order to complete and maintain the paperwork that was required to be submitted to the Defendant.  Wendy testified that she accounted for the money paid by the Defendant and kept track of expenses.

7. While on the road with the Plaintiff, Wendy usually spoke with Angela, who had authority to give instructions to Wendy and the Plaintiff regarding the next destination to which the Plaintiff was to report, the paperwork to be completed, and other routine matters that arose while the Plaintiff and Wendy were on the road.

8. Wendy testified that she was given several priority mail envelopes which were pre-addressed to the Defendant at his home address.  Wendy would place the completed paperwork and confirmation notice of the trip in a manila envelope, write the trip number on the front of the manila envelope which in turn would be

4

placed in the pre-addressed priority mail envelope and sent to the Defendant, with copies also sent to Worthington and a third set kept by the Plaintiff. Both Wendy and the Plaintiff testified that, after July 15, 2005, there was not a trip for which they did not promptly complete the required paperwork and send it to the Defendant in the pre-addressed priority mail envelope, with copies to Worthington.

9. Angela testified that normally it took her one to two weeks to process the paperwork from the time she received it from Wendy or the Plaintiff, due in part because she, too, rode with her husband, the Defendant, white hauling loads.

10. The Plaintiff's next trips (now accompanied by Wendy) were on July 18th (#539), July 22nd (#541) and July 27th (#543). Angela computed the compensation owed to the Plaintiff for trips #539 and #541 on August 10th and computed the amounts owed on trip #543 on August 11th. Angela issued a check to the Plaintiff in the amount of $1224.78 (the "Second Check") on August 12th to cover the amounts owed to the Plaintiff for trips #539, #541 and #543. Since the Plaintiff and Wendy would have been on the road when Angela issued the Second Check, it was sent to the Plaintiff's bank for direct deposit. Wendy testified the Second Check was "received" by the bank around August 16th.

11. With respect to the Second Check, a span of 14 days expired between the Plaintiff's last trip and the time Angela computed the Plaintiff's compensation. This 14 day span included the first part of August, which coincided with the Plaintiff's next trips which occurred on August 2nd (#545), August 4th (#547) and August 6th (#549). Concerned that he was embarking on August trips when at

5

that point he hadn't been paid for the last three trips in July, the Plaintiff and Wendy complained to Angela and the Defendant about the delay in payment despite their timely completion of the required paperwork.

12. In response to the Plaintiff's and Wendy's inquiries regarding payments, the Defendant and Angela gave them, on various occasions, a variety of reasons for nonpayment: (1) they and/ or Worthington had not received the Plaintiff's paperwork; (2) they had received the paperwork but Angela couldn't compute what was owed because she was on the road with the Defendant; (3) Worthington had not paid the Defendant for the load hauled; and, (4) prior to issuing the Third Check (see paragraph 15, below), Angela had lost the address of the Plaintiff's bank and needed the correct address from the Plaintiff.

13. The Plaintiff and Wendy testified that they assumed the Defendant and Angela were telling the truth and, in reliance of such statements, the Plaintiff continued to haul freight for the Defendant.

14. To give the Plaintiff and Wendy further cause for concern, Wendy testified that, during August and September, there were insufficient funds in the "T check account" from which to pay for fuel and therefore the Plaintiff would have to obtain a "COM check" from Worthington.

15. Angela testified that on August 23rd she issued a $1500 check payable to the Plaintiff (the "Third Check") covering trips #545, #547 and #549, even though the Plaintiff had not submitted his paperwork for these trips by that point. She testified that she issued the check because she was trying to get money to the Plaintiff and Wendy so that they could cover their expenses.

16. The Third Check, like the Second, was to have been sent to the Plaintiff's bank, but Angela was with the Defendant on a haul in Florida and did not have the bank's address. She was given an address by the Plaintiff or Wendy and she sent the check eight days later on September 1st, a delay she attributed to the Plaintiff's delay in providing the bank's address to her. Wendy called Angela asking about this check and Angela told Wendy the check had been sent.

17. The Third Check never reached the Plaintiff's bank, because it was returned to the Defendant on or about September 8th (either because the Plaintiff gave Angela the wrong address or Angela put the wrong address on the envelope). At this point, the Plaintiff was still working for the Defendant. Angela testified that the Defendant called the Plaintiff's home and talked to Wendy and told her that the check had been returned to him, but neither Wendy nor the Plaintiff came to pick it up, despite their prior pleas for payment.

18. The Defendant held the returned Third Check in his possession, still in the envelope in which it was mailed, until the June 19, 2008 trial. At trial, the envelope was opened, and it contained the Third Check along with a deposit ticket from the Plaintiff's bank account filled out in the amount of $1500. The deposit ticket also contained the Plaintiff's home address. Angela acknowledged that she was aware the deposit slip contained the Plaintiff's home address when she placed it along with the Third Check in the mail on August 23, 2005 but neither she nor the Defendant re-mailed the Third Check to the Plaintiff's home address. Instead, Angela maintained, the Defendant called the Plaintiff and asked him what he wanted the Defendant to do with the Third Check and both

7

the Plaintiff and Wendy refused to pick up it up.

19. The Plaintiff drove five (5) more trips for the Defendant between August 10th and his last day of employment: trip #550 on August 10th, trip #554 on August 22nd, and trips #556, #558 and #559 in early September, the dates of which are unknown. Angela computed the amounts owed to the Plaintiff on trips #550 and #554 on September 11, 2005, after the Plaintiff quit hauling freight for the Defendant. She issued no check for these two trips. However according to her calculations, Angela, as of September 11th, knew that an additional $804.84 [1] was owed for trips through August 22nd, not including the Third Check of $1500 which was never received by the Plaintiff. Thus, as of September 11th, Angela knew the Defendant owed the Plaintiff $2304.84. Angela computed the amounts owed for trips #545, #547, #549, #550 and #554 within 20 days from the date of the last trip (August 22nd).

20. Angela testified she did not compute the amount owed for the last three trips in September (#556, #558 and #559) because the Plaintiff failed to provide the paperwork to her. However, Angela likewise testified that it usually took one to two weeks to calculate the amounts owed to the Plaintiff and on three previous occasions, she completed such calculations between 14 and 20 days from the

---

[1] Defendant's Exhibit F admitted at trial consists of the calculation worksheets for all trips other than the last three driven in September (#556, #558 and #559). The amount owed to the Plaintiff on trip #549 was calculated as $587.45 but that figure was incorrectly carried over to the last page as $523.45 when the amounts for the five trips in August were totaled. Using the correct figure of $587.45, the corrected amount owed as of September 11th for all trips up to #554 (August 22nd) is $2348.04 (which includes the uncashed Third Check of $1500) and, including other minor amounts owed to the Plaintiff and an adjustment for a drug screen cost (all of which result in a net credit to the Plaintiff in the amount of $20.39), the corrected amount owed to the Plaintiff as of September 11th is $2368.43.

      date of the last trip included in the calculations.  Consequently, it is obvious that the Plaintiff and Wendy always sent their paperwork to Angela immediately after the final trip in the series of trips for which they sought payment.

21. As of September 6th and while still in the Defendant's employ, the Plaintiff had not been paid for any of the August or September trips (having received only the First and the Second Checks as the Third Check had been returned to the Defendant) but was unable to "come off the road" since the his trips took him to California and Arizona.  The Plaintiff did not have the option of abandoning the Rambling Fever truck since he would have had no method of transportation back to his Indiana home.

22. When Wendy questioned the Defendant and Angela yet again about nonpayment for the August and September trips, they were told that Worthington had not paid the Defendant.  Wendy at this point contacted Worthington and after this contact , called the Defendant back and confronted him with the information she received from Worthington.  Even after Wendy confronted the Defendant with what she had learned from Worthington, the Defendant continued to maintain that he had not been paid by Worthington. The Plaintiff quit working for the Defendant shortly after this conversation.

23. After the Plaintiff quit working for the Defendant, and a little over a week after the Third Check had been returned to the Defendant, the Plaintiff sued the Defendant in Madison County Circuit Court.

24. Although the Defendant knew *as of September 11th* that he owed the Plaintiff a minimum of $2368.43 (the "corrected" amount of $868.43 plus the Third Check

9

of $1500 which had been returned to the Defendant), Angela testified that they did not attempt to pay the Plaintiff because he had already filed a lawsuit against them. In fact, the lawsuit was not filed until five days later, *on September 16, 2005.*

25. Although the record is not clear as to how and when the Defendant was served with the complaint and summons, the record is clear that a default judgment was entered against the Defendant and Rambling Fever on February 14, 2006 and that the Defendant and Angela were aware that a default judgment had been entered against those parties.

26. The default judgment did not contain an award of damages, and thus a damages hearing was first scheduled for March 21, 2006 and then continued to November 14, 2006 and finally scheduled for February 6, 2007. The Defendant failed to attend the February 6th hearing, and prior to the hearing on that day, contacted Madison Circuit Court personnel and informed them that he was in Kentucky and would be unable to attend the hearing. The hearing was held and a judgment was entered on February 20, 2007.

27. Prior to the entry of the judgment on February 20th, the Defendant and Angela knew they owed the Plaintiff money and knew the Plaintiff had sued them and that the lawsuit was pending, but they did not pay the Plaintiff. At or around the damages hearing scheduled for November 14, 2006, Judge Spencer of the Madison Circuit Court ordered Plaintiff's counsel Daniel Whitehead to turn over the paperwork for Plaintiff's final three trips. Angela computed the amounts owed for those trips on December 3, 2006, more than two months before the

     final damages hearing on February 6, 2007. Consequently, as of December 3, 2006, Angela knew that, by her calculations, the Defendant owed the Plaintiff at least $3949.39 [2], yet she never tendered this sum of the Plaintiff.

28. Despite the Defendant's call to report that he would be unable to attend the February 6th damages hearing, the Madison Circuit Court nonetheless conducted the damages hearing on February 6th and found that the Plaintiff had suffered $12,719.75 in actual damages "for unpaid wages", actual damages of $28,900.00 for "home equity loss", treble damages in the sum of $25,439.50, and attorneys' fees of $2750.00 for a total judgment of $69,809.50 (the "Debt").

29. The Defendant testified that he knew he was "being sued" for about $69,000. After the court awarded damages, the Defendant hired an attorney. The Defendant was under the impression that the judgment had been set aside, but no such evidence exists in the record and, after inquiry to the Madison Circuit Court, this Court has learned that the judgment has not been set aside.

30. The parties and their respective counsel met after the award of damages but no resolution was reached. The Defendant filed a chapter 7 case on May 23, 2007.

### *Conclusions of Law*

1. The Plaintiff alleges that the Debt is nondischargeable under §523(a)(2)(A)[3].

---

[2] Angela calculated that the Plaintiff was owed $1644.55 for the final three trips, bringing the total of what the Plaintiff was owed (according to Angela's calculations) to $3949.39. ($2304.84 + $1644.55). Angela arrived at this figure by using the erroneous $523.45 figure for trip #549 and the erroneous figure of $2304.84 for what was owed for trips other than the last three in September. The correct amount owed to the Plaintiff at that point was $4012.98 ($2368.43 + $1644.55).

[3] All section references are to the Bankruptcy Code (Title 11) unless otherwise stated.

11

2. Exceptions to discharge under §523 are "to be construed strictly against the creditor and liberally in favor of a debtor." *In re Scarlata*, 979 F.2d 521,524 (7th Cir. 1992. A creditor that brings a §523 action seeking a determination of nondischargeability bears the burden of proving all the elements of the statute by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 289-90; 111 S.Ct. 654, 661; 112 L.Ed.2d 755 (1991)

3. Under §523(a)(2)(A), an individual debtor shall not be allowed a discharge for any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by (A) false pretenses, a false representation, or actual fraud..." 11 U.S.C. § 523(a)(2).

4. Section 523(a)(2)(A) list three separate grounds for dischargeability: actual fraud, false pretenses and false representation. Although many courts have applied the same test to all three grounds, the Seventh Circuit has distinguished between the three grounds and has formulated two different tests, one for the "false pretenses" and "false representation" grounds and another for the "actual fraud" ground. *In re Scarpello*, 272 B.R. 691, 699-700 (Bankr. N. D. Ill. 2002); citing *McClellan v. Cantrell*, 217 F.3d 890, 894 (7th Cir. 2000).

5. To prevail on a nondischargeability claim under the "false pretenses" or "false representation" grounds set forth in §523(a)(2)(A), a creditor must prove *all* of the following elements: (1) the debtor obtained money, property or services through representations which the debtor either knew to be false or made with such reckless disregard for the truth as constitute a willful misrepresentation; (2) the debtor possessed scienter, i.e. an intent to deceive; and (3) the creditor justifiably

relied on the false representation to his detriment. *Scarpello*, 272 B.R. at 700.

6. A misrepresentation can occur not just though a verbal representation, but also through a debtor's conduct that was intended to create a false impression, but the representation – regardless in what form made – must be with respect to a material fact. *Scarpello*, 272 B.R. at 700.

7. Proof of intent to deceive is determined by a review of all of the relevant factors of the particular case and is measured by the debtor's subjective intention *at the time the representation was made*. Where a person knowingly or recklessly makes false representations which the person knows or should know will induce another to act, the finder of fact may logically infer an intent to deceive. *Mayer v Spanel International, Ltd (Matter of Mayer),* 51 F.3d 670, 673 (7th Cir. 1995); *Bletnitsky v. Jairath (In re Jairath),* 259 B.R. 308, 314 (Bankr. N. D. Ill. 2001).

8. Reliance on the false pretense or false representation must be justifiable, which at least one court has described as an "intermediate level of reliance". *Scarpello*, 272 B.R. at 700. This intermediate level of reliance "imposes no duty to investigate unless the falsity of the representation is readily apparent". *Scarpello*, 272 B.R. at 700. Whether there was justifiable reliance by the creditor is measured by a subjective standard; that is, the creditor must show that the debtor "made a material misrepresentation that was the cause-in-fact of the debt that the creditor wants excepted from discharge." *Scarpello*, 272 B.R. at 700; *Mayer*, 51 F.3d at 676.

9. A slightly different test is used where the creditor alleges the debt is

13

nondischargeable under the "actual fraud" part of §523(a)(2)(A).  In such cases, a creditor must prove (1) a fraud occurred; (2) the debtor was guilty of intent to defraud; and (3) the fraud created the debt that is the subject of the nondischargeability action.  *McClellan*, 217 F.3d at 893; *Scarpello*, 272 B. R. at 701.  Noteworthy is the fact that "actual fraud" is not limited to misrepresentation, and therefore, to state a claim under the "actual fraud" prong of §523(a)(2)(A), one need *not* allege misrepresentation and reliance thereon.  *McClellan*, 217 F.3d at 893; *Scarpello*, 272 B.R. 701.

10. The Plaintiff's complaint does not specify whether the Debt was created by "false pretenses and false representations" or "actual fraud" but under both prongs, there must be an intent to deceive or defraud.

11. It has been this Court's experience that "typical" §523(a)(2)(A) actions before it have hinged on whether the defendant possessed the requisite intent to deceive and not the credibility of witnesses, as there is little serious disparity between the parties' versions of the facts.

12. This case is not "typical".  Large parts of the testimony of the parties cannot be reconciled, such as:

    (a)   the Plaintiff's and Wendy's testimony that the Defendant's reason for slow payment or nonpayment was because Worthington had not paid the Defendant compared to the Defendant's and Angela's testimony that no such reason was ever given, rather, the Plaintiff was told that the Defendant and Worthington had not received his paperwork;

    (b)   the Plaintiff and Wendy's testimony that there was never a trip for which

        they didn't complete and send the paperwork to the Defendant and Worthington on a timely basis compared to the Defendant's and Angela's testimony that the Plaintiff was untimely in submitting the paperwork for trips #545, 547 and 549 and their failure to submit the paperwork for the last three trips in September until over a year later, when it was mailed to them by the Plaintiff's attorney, Mr. Whitehead, on November 29, 2006;

(c)     the Plaintiff's and Wendy's testimony that, after the July trips, they complained almost on a daily basis to the Defendant or Angela about not being paid compared to the Defendant's and Angela's assertion that the Plaintiff or Wendy complained only once, and would be surprised if they complained two or three times; and

(d)     the Plaintiff's testimony about the need to be paid and his dire financial straits compared to the Defendant's testimony of the Plaintiff's indifference to picking up the Third Check once it had been returned to the Defendant.

13.     Then there is testimony of the Defendant and Angela which the Court simply finds not credible. For example, the Third Check was returned to the Defendant due to an improper bank address, when the Second Check was not returned and in fact cleared the bank on August 15, 2005. (It is difficult to believe that the Plaintiff would supply the Defendant with an incorrect bank address when the Plaintiff was making inquiries as to when he would be paid). Even more puzzling is the fact that the returned envelope – containing the Third Check and the deposit slip–was not opened until the day of trial. By September 11th, three days after the envelope was returned to the Defendant, Angela calculated that the Defendant

15

owed the Plaintiff $868.43, in addition to the $1500 Third Check.  The deposit slip which the Defendant had mailed with the Third Check contained the Plaintiff's home address, yet, once the envelope was returned, there was no attempt to destroy the Third Check and issue and mail a new check for $2368.43 which was actually owed to the Plaintiff.  Rather, the Defendant would have the Court believe that the Plaintiff, who at that point had received only two checks for the July trips, would choose to sue the Defendant rather than pick up a $1500 check he desperately needed.

14. Equally incredible is the notion that the Plaintiff failed to submit his paperwork for the final three trips in September, 2005 until November, 2006, over a year later, when attorney Whitehead turned it over to the Defendant.  This notion is inconsistent with the fact that Angela computed the amounts owed to the Plaintiff for the first, second and third trips within 15, 14 and 20 days of the last trip for those respective periods, and Angela needed the paperwork from the Defendant to perform the calculations.  Again, the Court is impressed with what had to have been an immediate turnover of the paperwork by the Plaintiff to Angela since Angela testified that it took her one to two weeks to process the paperwork and calculate the amount owed to the Plaintiff.

15. The Court also finds it incredible that, despite knowing that he owed the Plaintiff $2,368.43 as of September 11th, the Defendant didn't pay this undisputed amount to the Plaintiff because the Plaintiff had already sued him.  In fact, there was a window (until September 16th) wherein the Defendant could have paid this amount before the Plaintiff sued him, but nonetheless there was no effort before

or after September 16th to pay the undisputed portion of what was owed the Plaintiff.

16. Angela's testimony with respect to their failure to attend the February 6, 2007 damages hearing is also not credible. At the absolute latest, Angela was sent the paperwork for the last three September trips in late November, 2006. In early December, Angela calculated that the Defendant owed $1644.55 for these trips, and undisputably owed the Plaintiff $3992.59 overall. Yet, between early December, 2006 and the damages hearing in February, 2007, there was no attempt to pay the Plaintiff this amount. Also suspect is Angela's contention that they did not find out about the damages hearing until the day of the hearing, and for that reason asked for a continuance, knowing that the damages hearing had been continued twice before when the Defendant failed to appear.

17. Much of the Defendant's and Angela's conduct would have been inconsistent with the way a solvent business would have handled these matters, and the Court cannot reconcile these inconsistencies. In that vein, the Defendant near the end of the trial testified that he and the Plaintiff were the only drivers hauling for Rambling Fever between July and September 2005, and that he was about to close down because he couldn't get loads to haul, and the rising fuel prices prevented him from hiring additional drivers. As is often the case, rather than paying what is owed, a business owner will use the money instead in an attempt to save the business. Here, it is the Court's conclusion that the Defendant misrepresented the fact that he had not been paid to induce the Plaintiff to continue to work for him in order to generate income from additional loads.

18. The Court finds the testimony of the Plaintiff and Wendy more credible. At the very least, the Defendant told the Plaintiff that he had not been paid by Worthington when in fact he had. This was a misrepresentation of an existing fact upon which the Plaintiff relied and continued to haul freight for the Defendant to his detriment.

19. The Debt was established by the Madison Circuit Court as the damages incurred by the Plaintiff as a result of the Defendant's misrepresentations. Accordingly, the Debt is found to be nondischargeable under §523(a)(2)(A) and a separate judgment will be entered.

### # # #

Distribution:

John M. Blevins, Attorney for Plaintiff
Steven P. Taylor, Attorney for Defendant
Case Trustee
United States Trustee